UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
AMY STEVENS, on behalf of E.L.,         :
                         Plaintiff,     :
                                        :    09 Civ. 5327 (DLC)
              -v-                       :
                                        :    OPINION AND ORDER
NEW YORK CITY DEPARTMENT OF EDUCATION,  :
                         Defendant.     :
                                        :
----------------------------------------X

Appearances:

For plaintiff Amy Stevens:
Sanford S. Stevens
Sanford S. Stevens, PC
244 Madison Avenue #303
New York, NY 10016

For defendant New York City Department of Education:
Steven D. Weber
New York City Law Department
100 Church Street
New York, NY 10017

DENISE COTE, District Judge:

Plaintiff Amy Stevens ("Stevens") brings this action on

behalf of her minor son, E.L. ("the Student"), pursuant to the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400

et seq. ("the IDEA").  The plaintiff seeks review of the May 12,

2009 administrative decision of State Review Officer Paul F.

Kelly ("the SRO"), which annulled in part the February 26, 2009

decision by Impartial Hearing Officer Susan C. Lushing ("the

IHO").  The IHO's decision had awarded Stevens tuition

reimbursement for the Jump Start portion of the Student's

educational program at York Preparatory School ("York Prep") for the 2007-08 school year.  The SRO found that no reimbursement was appropriate.

The defendant moves for summary judgment, seeking dismissal of the plaintiff's complaint.  The plaintiff cross-moves for summary judgment and is seeking an order overturning the SRO's determination and awarding full tuition reimbursement for both Jump Start and the rest of the Student's educational program at York Prep.  Because the defendant conceded that it failed to offer the Student an appropriate education as required by the IDEA, the only issues in dispute are whether the SRO erred in concluding that York Prep was not an appropriate unilateral placement; whether the Jump Start program at York Prep was reimbursable as a special education service, and whether the equities favor reimbursement.  For the reasons set forth below, the defendant's motion for summary judgment is granted.

STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A) & (B); see also Forest Grove Sch. Dist. v. T.A., __ U.S. __, 129 S. Ct.

2484, 2491-92 (2009) ("Forest Grove") (discussing the purposes of the IDEA).  States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1)(A).  To this end, IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually.  20 U.S.C. § 1414(d)(2)(A); see also Honig v. Doe, 484 U.S. 305, 311 (1988) ("[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."); D.D. ex rel. V.D. v. N.Y. City Bd. of Educ., 465 F.3d 503, 507 (2d Cir. 2006) (describing the IEP as "[t]he centerpiece of the IDEA's educational delivery system" (citation omitted)).  In New York City, there are "Committees on Special Education" ("CSEs") in each community school district that convene with the parents to develop an IEP for a student. N.Y. Educ. L. § 4402(b).

The IDEA requires that parents be provided an opportunity to present a complaint with respect to the identification, evaluation, or placement of their child through the IEP process. 20 U.S.C. § 1415(b)(6)(A).  Where the parents believe that the

school district has not adequately responded to their complaints, the IDEA requires that they be given an opportunity to pursue their grievances through an "impartial due process hearing." Id. § 1415(f)(1)(A).  In New York, these hearings are conducted by an IHO, and parties aggrieved by the IHO's decision may appeal to the SRO.  See N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1).  The IDEA further provides that the final administrative decision may be reviewed "in a district court of the United States" by "bring[ing] a civil action with respect to the complaint."  20 U.S.C. § 1415(i)(2)(A).  The district court is empowered to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it.  Id. § 1415(i)(2)(C); see also Forest Grove, 129 S. Ct. at 2492 (noting that the IDEA "gives courts broad authority to grant 'appropriate' relief").  The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." Forest Grove, 129 S. Ct. at 2488; see 20 U.S.C. § 1412(a)(10)(C).

FACTUAL BACKGROUND

The following facts are taken from the administrative record, and are undisputed unless otherwise indicated.

A. The Student's Special Education History

Stevens is the mother of the Student.  The Student was born on July 18, 1992, and during the 2007-08 school year, he was fifteen years old and in the ninth grade.  In the most recent IEP before the 2007-08 school year, the Student was classified as learning disabled.  Stevens testified that the Student was diagnosed with autism when he was a toddler, and then with an emotional disturbance, before being diagnosed as learning disabled.  Prior to the 2007-08 school year, the Student had always attended private special educational schools.

B. The 2006-07 School Year and Application Process

For the 2006-07 school year, when the Student was in the eighth grade, the Student attended Winston Preparatory School ("Winston Prep"), a private special education school.  Stevens testified that in the fall of 2006, she applied for the Student's admission to York Prep, a private regular education school, and that for six months prior to that, the Student had received private tutoring to prepare him for the required entrance examination.

In January 2007, a CSE meeting was held to develop an IEP for the Student for the remainder of the 2006-2007 school year

(the "January 2007 IEP").  Stevens attended, as did representatives from the Student's school and the school district.  Stevens did not advise the defendant during that meeting that she had applied to admit the Student to York Prep.

The January 2007 IEP was for one year, although it was scheduled to be reviewed at the end of June 2007.  The IEP recommended collaborative team teaching with counseling, occupational therapy, and speech/language therapy.  According to the IEP, the Student demonstrated strengths in "written mechanics and decoding" and weaknesses in inferencing skills, organization, and percentiles and fractions.  The Student's academic performance was described as being below grade level in reading comprehension and written expression, at grade level in "letter-word ID," and below grade level in math computation and problem solving.  The IEP listed the Student's "academic management needs" as "semantic maps and outlines to organize thoughts; visual cues-charts."  As for social/emotional performance, the Student was noted to be demonstrating "increased maturity and improved self advocacy," but that social problem-solving skills were a weakness.

The IEP noted that other education recommendations had been considered and rejected: general education with special education teacher support services ("SETSS") was "considered inadequate to address [the Student's] academic weaknesses,"

while a special class in a community school was "too restrictive given [the Student's] academic strengths and weaknesses." Instead, as noted, the IEP recommended collaborative team teaching and a continuation of the Student's existing special services: one session of counseling in a small group per week, one session of one-on-one occupational therapy per week, and two sessions of speech/language therapy in a small group per week. The Student was given the testing accommodations of double time; small group setting; directions read, re-read and re-phrased; and answers recorded in any manner.

York Prep accepted the Student for enrollment for the 2007-08 school year on February 14, 2007.  According to the admission letter, York Prep "require[d] that [the Student] enroll in our Jump Start program in order to receive the support he needs in making the transition" to York Prep.  On March 1, Stevens signed the Student Enrollment Contract, whereby she agreed to pay all tuition and fees for the 2007-08 school year, including a non-refundable $4,000 deposit.  The total tuition obligation for the year was $46,250,[1] which included a separate tuition of $13,800 for the Jump Start program.  Stevens paid the $4,000 deposit on March 6, 2007 using a check drawn on her attorney's professional

---

[1] This amount does not include a $600 "voluntary contribution toward the scholarship fund" that appears on a March 2007 invoice but was not included in the amounts paid to the school on behalf of the Student.

account and signed by him, and paid the balance of the tuition using checks post-dated for May 28, July 18, October 13, and December 10, 2007.[2]  The Student started his ninth-grade year at York Prep in September 2007.  As of that date, Stevens had not yet advised the defendant either that the Student had been admitted to York Prep or that he had begun to attend the school.

   C. The 2007-08 School Year at York Prep

     York Prep is not approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities.  At York Prep, the Student was in regular education classes described as being "highly structured" and with a class size of thirteen or fourteen students and one

---

[2] In the proceeding before the SRO, the defendant argued that the plaintiff lacked standing to seek reimbursement because she had not paid the tuition herself.  The plaintiff's attorney explained that, as Stevens's father (and the Student's grandfather), he had loaned her an original amount for tuition at a private school years earlier, which was then reimbursed by the school system, at which point he put those funds in escrow and used them to pay the Student's tuition the following year, and when reimbursed, placed the funds again in escrow for subsequent years' tuition.  Stevens testified that she "paid for the tuition separately to [her] attorney" but could not recall when.  The SRO did not reach the defendant's standing arguments. The IHO "accept[ed] the explanation given by the parent for the use of checks in the attorney's name" as part of her determination that there was no equitable impediment to awarding partial tuition reimbursement.  "Standing doctrine requires that reimbursement should flow only to those who actually expend resources."  Emery v. Roanoke City School Bd., 432 F.3d 294, 299 (4th Cir. 2005) (citation and emphasis omitted).  The defendant did not raise its standing argument in its summary judgment motion, so the issue was not briefed by either party. Because Stevens is not entitled to reimbursement under the IDEA, the question of statutory standing need not be reached.

general education teacher.  He was assigned daily homework.
Stevens could access the Student's grades via a secure website
that was updated weekly, and the Student's teachers could write
notes to the parent there as well.  The record does not indicate
any modifications or specific strategies adopted for the Student
in these general education classes.

The Jump Start program is a "supplementary program beyond
the extent of the usual academic coursework that any student
would take."  The program consisted of two forty-five minute,
one-on-one sessions between the Student and a special education-
certified instructor named Ms. Farkas ("Farkas") per week, as
well as small group meetings of ten or eleven students with
Farkas for thirty or forty-five minutes every morning and for
forty-five minutes four afternoons per week.  Approximately
thirty percent of all York Prep students participate in Jump
Start, which is a condition of acceptance for some students,
like the Student, and suggested or optional for others.
According to testimony by the school psychologist, Dr. Reese
("Reese"),[3] Farkas worked with the Student on organization and
writing, and she coordinated these efforts with his teachers,
specifically his English and math instructors.  In the one-on-
one sessions, Farkas would help the Student with particular

---

[3] Dr. Reese was the only individual authorized by York Prep to
appear at the hearing.

assignments with which he struggled, but had no set curriculum or activities planned for the Student.  For example, if the Student was having trouble structuring an essay for a class, they would work together on the structure for that assignment. In the group sessions, Farkas would "give [the Student] some attention that would require no more than a couple of minutes to clarify" or would communicate with his subject-matter teachers on issues that had arisen.  She described her work with the Student as doing a daily homework check, reviewing his student planner for assignments, helping the Student organize his binders, assisting him with test preparation, academic tutoring, and "advocacy skills for academic programs (example switch to Honors Math)."  The Student emailed Farkas daily about homework completion and any concerns related to his homework for the next day.  The Student received no other special services, such as speech or occupational therapy, at York Prep.  The student earned a 95 grade point average for the year, which placed him on the Headmaster's List, and had perfect attendance for the entirety of the school year.

    D. The Impartial Hearing

    On December 22, 2007, or about three months after the Student entered York Prep, Stevens's attorney contacted the CSE. The letter stated simply:  "[The Student] is considered a student with disabilities pursuant to the IDEA currently

attending [York Prep].  The CSE has not contacted us regarding developing an IEP for [the Student] for the academic year 2007-2008.  We request that the CSE contact us to schedule a meeting."  On January 24, 2008, Stevens requested an impartial hearing "for the purpose of reimbursement of tuition and related expenses for the academic year '07-'08."  This was the first time Stevens notified the defendant that she was seeking tuition reimbursement.  That application for an impartial hearing was procedurally defective, and was not renewed until July 3, 2008.

The impartial hearing was held on December 17, 2008, and February 11, 2009 before the IHO.  Stevens called three witnesses: Reese, Koren Brigham ("Brigham"), and herself.  The defendant called no witnesses.  At the impartial hearing, the defendant conceded that it had not provided a FAPE for the Student for the 2007-08 school year.  Therefore, the hearing focused only on the appropriateness of York Prep as a placement and any equitable considerations for or against reimbursement.

Reese testified as to the educational program at York Prep, including Jump Start.  When asked the extent of the "organizational issues" that the Student faced, he said they were "substantial."  He also testified that the Student earned grades in the "low to middle 90s, which for us, is very good," that the Student was a hard worker who compensated for his

difficulties and got the help he needed to do well in the ninth grade.

Brigham is an applied behavioral analyst who worked with the Student from age three to thirteen, and who still acted as a consultant to Stevens with respect to the Student's education. She testified that after meeting with the Student's teachers at Winston Prep, she and they both believed that a less restrictive environment would be appropriate for the ninth grade. She testified that she did not believe that the Student was ready for a collaborative team teaching class or a mainstream school for the ninth grade, but that she believed York Prep was appropriate for the Student and recommended that he enroll there. Brigham did not meet or speak with anyone at York Prep, however, and received all of her information about the Student's education there from Stevens.

Stevens described the Student's learning disability as related to "executive functioning and organizational skills." She said that she had visited a collaborative team teaching classroom three to four times in the past when the Board of Education had recommended one for the Student, but that they were not appropriate for him. She described one of his significant achievements for his ninth grade year as having perfect attendance. Stevens testified that she coordinated with all of the Student's teachers at Winston Prep in applying to

York Prep for the Student's ninth grade year.  With respect to
applying to York Prep, she said:

> [B]ecause it requires so much lead time to
> do that, sometimes the timing is not in sync
> with the Board of Ed.  And I just wanted to
> point that out, that the process for schools
> is well in advance of whatever
> recommendations the Board of Ed might make,
> which in this year, there is no
> recommendation.  But in prior years it was
> well in advance.
> . . . .
> [W]ithout the benefit of the Board of Ed
> providing a placement, I needed to go
> forward with a placement for [the Student].
> And so I would be open to a public school
> environment if it was timely, meaning at the
> time that I needed to start this process for
> a private school, if I had an idea from the
> Board of Ed, I would have looked at it, or
> at any time.

E. The IHO's Decision

The IHO rendered her Findings of Fact and Decision on
February 26, 2009.  The IHO found that the Jump Start component
of the Student's education at York Prep "provided specialized
services individualized to meet the student's specific
educational needs and as such is reimbursable."  She found that
the remainder of the Student's program at York Prep, in "regular
academic classes taught by general education teachers without
any instances of modifications or the use of special strategies"
was not reimbursable.  The IHO stated that while the Student
"benefited from the small group instruction and made progress in
academic subjects as well as socially and emotionally at York

Prep., only Jump Start fits the definition of special education services."  Finally, the IHO found that there was no equitable reason to disallow reimbursement in this case despite Stevens's commitment to York Prep in March 2007 due to the "uncertainty as to the DOE's placement recommendations" for the 2007-08 school year.  The IHO therefore ordered the DOE to reimburse Stevens for the Jump Start program in the amount of $13,800.

F. The SRO Appeal and Decision

Stevens appealed the IHO decision to the SRO.  In the petition for review, Stevens argued that the defendant had failed to provide an IEP or make a placement recommendation for the 2007-08 school year and that the parent followed the advice of Brigham and the Student's teachers at Winston Prep in enrolling him in York Prep.  She therefore "request[ed] that the SRO find that the DOE is responsible for the full tuition at York Preparatory School."  The defendant cross-appealed and asked that Stevens's appeal be denied in its entirety for failing to comply with certain procedural requirements.[4]  In the

---

[4] The administrative regulations for New York require that a "petition for review shall clearly indicate the reasons for challenging the impartial hearing officer's decision, identifying the findings, conclusions and orders to which exceptions are taken, and shall indicate what relief should be granted by the State Review Officer to the petitioner."  N.Y. Comp. Codes R. & Regs. tit. 8, § 279.4(a).  Additionally, the regulations give the SRO discretion to reject documents that do not conform to the format requirements, such as being double spaced and citing to specific pages of the IHO decision,

alternative, the defendant asked the SRO to vacate the portion of the IHO decision that found that Jump Start was appropriate and that awarded tuition reimbursement for that program.

The SRO issued his decision on May 12, 2009.  <u>See</u> <u>Application of a Student with a Disability</u>, Appeal. No. 09-048 (May 12, 2009).  The SRO dismissed Stevens's appeal and sustained the defendant's cross-appeal, finding that reimbursement for Jump Start was not appropriate.  The SRO agreed with the IHO that the hearing record provided "insufficient evidence that the non-Jump Start portion of the York Prep program provided specialized instruction or services to the student designed to meet the student's special education needs as identified in the hearing record."  The SRO also found that the hearing record did not support the IHO's finding that reimbursement for Jump Start was appropriate.  "In particular . . . I find that the sparse hearing record lacks sufficient information regarding the student's individual special education needs and how Jump Start provided educational services specifically designed to meet the unique needs of the

---

transcript, or exhibit.  <u>Id.</u> § 279.8.  Stevens's petition for review is single-spaced and contains eight numbered statements listed as undisputed facts, a narrative discussion paragraph, and a conclusion paragraph.  There are no citations to the IHO decision, the record, or any legal authority.  Additionally, Stevens failed to comply with § 279.4(b) by failing to file an answer to the district's cross-appeal.  She also did not file a reply to the procedural defenses that the defendant raised.

student." The SRO found that other than Stevens's description
of the Student's problems (as being related to executive
function and organization) and the "limited, vague description
of the student's areas of weakness from the January 2007 IEP,"
there was little current information about the "nature, degree,
and extent of the student's special education needs," such as
would be provided by evaluation reports, testing, evidence of
what types of organizational difficulties the Student exhibited
or how it affected him in the classroom, or what individual
strategies Farkas provided to address the deficit. The SRO
therefore found that the parent had not shown that Jump Start
was appropriate to meet the Student's special education needs.
Additionally, the SRO found that the IHO's conclusion that the
Student "made progress in academic subjects as well as socially
and emotionally" was unfounded in the record because there was
no benchmark for comparison and the record was "devoid of
information" about the student's social/emotional needs. Under
the totality of the circumstances, the SRO found that the parent
had not shown that "the placement at York Prep and Jump Start
was reasonably calculated to enable the student to receive
educational benefits related to his special education needs."
With respect to equitable concerns in this case, the SRO found
that "the parent failed to provide the notice [of intent to
enroll the Student in a private school] required by the IDEA,

and therefore, is not entitled to an award o[f] reimbursement on that basis."

On June 9, 2009, Stevens timely filed a complaint seeking review of the SRO's decision, as authorized by 20 U.S.C. § 1415(i)(2)(A) and N.Y. Educ. L. § 4404(3)(a).  An amended complaint was filed September 1, 2009.  The defendant filed a motion for summary judgment on October 2, 2009, and the plaintiff cross-moved for summary judgment on November 1.  The motions were fully submitted on January 7, 2010.  The administrative record was not filed with the Court until early February.

DISCUSSION

  A. Standard of Review

    Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment."  Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact."  Id.  Rather, the court conducts an "independent" review of the administrative record, basing its decision on the "preponderance of the evidence."  Bd. of Educ. v. Rowley, 458 U.S. 176, 205 (1982) (citation omitted).  Summary judgment thereby "serves as a

pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." Lillbask, 397 F.3d at 83 n.3 (citation omitted).

Nevertheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted), and "courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" Id. (quoting Rowley, 458 U.S. at 206).  "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. (citation omitted). Deference is "particularly warranted where . . . the district court's decision [is] based solely on the administrative record," A.C. & M.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) ("A.C."), and when "the state hearing officers' review has been thorough and careful." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). The court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." A.C., 553 F.3d at 171 (citation omitted).

In cases where "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight."  Id. (citation omitted).

   B. Tuition Reimbursement

      When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state.  See Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12 (1993) ("Carter"); Sch. Comm. of Burlington, Mass. v. Dep't of Educ., 471 U.S. 359, 369-70 (1985) ("Burlington").  Under the Burlington-Carter test for tuition reimbursement, plaintiffs are entitled to reimbursement of private school tuition if (1) the IEP was not "reasonably calculated to enable the child to receive educational benefits," (2) "the private schooling obtained by the parents is appropriate to the child's needs," and (3) equitable considerations support the plaintiffs' claim.  T.Y., 584 F.3d at 417 (citation omitted); see also Forest Grove, 129 S. Ct. at 2496 ("Parents are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act. And even then courts retain discretion to reduce the amount of a

reimbursement award if the equities so warrant . . . ."
(citation omitted)).

1. Appropriateness of the Placement at York Prep

In this case, the defendant conceded that it did not provide the Student with a FAPE for the 2007-08 school year. Therefore prong 1 of the Burlington-Carter test is resolved in favor of Stevens.

The second prong, the appropriateness of Stevens's unilateral placement of the Student at York Prep, is disputed by the parties.  Under New York law, the burden of proof falls upon the parents to show that their unilateral placement at a private school was appropriate.  See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 58 (2005) (concluding that "the burden of persuasion lies where it usually falls, upon the party seeking relief"); N.Y. Educ. L. § 4404(1)(c) (placing the burdens of production and persuasion as to the appropriateness of a unilateral placement on the parents).  Thus, New York parents who believe that the state has failed to offer a FAPE act "at their own financial risk" when they choose to enroll their child in a private school.  A.C., 553 F.3d at 171 (citation omitted).

The standards for determining whether a private school placement is "appropriate" under the IDEA are similar but not identical to the standards for assessing the adequacy and appropriateness of the proposed public placement.  The Second

20

Circuit has explained that "[s]ubject to certain limited exceptions, the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (citation omitted). "The issue turns on whether a placement -- public or private -- is reasonably calculated to enable the child to receive educational benefits." Id. (citation omitted). "A private placement meeting this standard is one that is likely to produce progress, not regression." Id. (citation omitted). "Nevertheless, parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education," and "[a]n appropriate private placement need not meet state education standards or requirements." Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006) (citing Carter, 510 U.S. at 14). Moreover, "a private placement need not provide certified special education teachers or an IEP for the disabled student." Id. (citation omitted). "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." Id. (citation omitted).

A student's academic progress in a unilateral private placement is relevant, but not dispositive, of the determination

of whether it is appropriate.  "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances."  Id. at 365.  The Second Circuit has cautioned:

> [P]rogress does not itself demonstrate that a private placement was appropriate. Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages that might be preferred by parents of any child, disabled or not.  A unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child.

Gagliardo, 489 F.3d at 115 (citation omitted).

Applying these principles, the preponderance of the evidence in the record supports the SRO's finding that neither York Prep nor Jump Start was an "appropriate" placement.  As a preliminary note, the SRO's decision is well-reasoned and his findings are well-grounded in the evidence.  Deference to his decision is therefore particularly appropriate.

The record shows that the Student's regular education classes were not "specifically designed" to meet the Student's "unique needs."  Gagliardo, 489 F.3d at 115.  While Stevens testified that the Student's subject-matter teachers coordinated with Farkas when a problem arose, there was no evidence that

these regular education teachers provided modifications or
special services to address the Student's deficiencies, for
example, by providing "semantic maps and outlines" or twice as
much time as other students for testing, as described in the
Student's prior IEP.  And although Reese testified that York
Prep provided a structured environment, small class size, and
traditional education with daily homework and frequent
communication with parents, these are nothing more than
"educational and environmental advantages and amenities that
might be preferred by parents of any child, disabled or not."
Id.

The record also supports the SRO's finding that Jump Start
was not specifically designed to meet the Student's unique
needs.  The SRO focused on what he deemed to be a "sparse"
record "devoid" of current, detailed information about the
Student's specific needs and deficits.  There is some evidence
in the record of the Student's deficits and how the Jump Start
program provided academic support to the Student, but it is not
sufficient to overturn the SRO's determination that the program
was not appropriate to meet the Student's special education
needs.  The record indicates that the Student suffered problems
with organization, both with respect to organizing his physical
materials for class and in organizing the content of writing
assignments.  Brigham testified that this meant he needed

someone to sit with him once a week and make a plan for completing assignments and to troubleshoot academic and social problems.[5]

The evidence offered by Stevens does not constitute an adequate showing that Jump Start was an appropriate placement. The Jump Start program did not provide a curriculum or individual goals for the Student.  It did not provide any of the specialized services, such as occupational or speech therapy, that the Student had previously needed and received.  There is also no detailed information about how the Student's deficits impacted his ability to function effectively in the classroom. Nor is there any information on what strategies or exercises Farkas implemented to address the Student's deficits.  Instead, Farkas apparently served as a general trouble-shooter and tutor. Finally, the record lacks any objective data that would provide benchmarks for measuring the Student's progress.  In sum, based on the preponderance of the evidence and giving appropriate deference to the SRO's decision, reimbursement for Jump Start is inappropriate on the record in this case.

---

[5] In contrast, the IEP for the 2006-07 school year more specifically describes the Student's deficits in reading comprehension, written expression, mathematical computation and problem solving, and social problem-solving, and identified strategies to employ to accommodate some of those deficits, such as using visual cues or charts.

2. Equitable Considerations

Even if Stevens had succeeded in showing that a unilateral private placement was appropriate under prong 2 of the Burlington-Carter analysis, she would still need to show the relief was warranted as a matter of equity. This she did not do.

"[C]ourts retain discretion to reduce the amount of a reimbursement award if the equities so warrant." Forest Grove, 129 S. Ct. at 2496. "[E]quitable considerations are relevant in fashioning relief, and the court enjoys broad discretion in so doing. Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." Carter, 510 U.S. at 16 (citation omitted); see also A.C., 553 F.3d at 171 ("In fashioning relief, equitable considerations relating to the reasonableness of the action taken by the parents are relevant." (citation omitted)).

One equitable consideration is whether and when the parents give the school district notice that the parents will unilaterally enroll the child in a private school. The IDEA directs:

> (iii) Limitation on reimbursement
> The cost of reimbursement . . . may be
> reduced or denied--
> (I) if--

25

> (aa) at the most recent IEP meeting that the
> parents attended prior to removal of the
> child from the public school, the parents
> did not inform the IEP Team that they were
> rejecting the placement proposed by the
> public agency . . ., including stating their
> concerns and their intent to enroll their
> child in a private school at public expense;
> or
> (bb) 10 business days . . . prior to the
> removal of the child from the public school,
> the parents did not give written notice to
> the public agency of the information
> described in item (aa);
> . . . . [or]
> (III) upon a judicial finding of
> unreasonableness with respect to actions
> taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii).  See M.C. ex rel. Mrs. C. v.
Voluntown Bd. of Educ., 226 F.3d 60, 67-68 (2d Cir. 2000).

These notice provisions are relevant to this case even
though sections (aa) and (bb) of the statute refer to removal
from the "public school."  Even before the IDEA was amended in
1997 to include sections (aa) and (bb), "courts ha[d] held
uniformly that reimbursement is barred where parents
unilaterally arrange for private educational services without
ever notifying the school board of their dissatisfaction with
their child's IEP."  Id. at 68.  Parents whose child is already
enrolled in a private school at public expense have the same
obligation to notify the school board of their intent to enroll
the student unilaterally in a different private placement as do
parents whose child is currently in a public placement.  S.W. v.

N.Y. City Dep't of Educ., 646 F.Supp.2d 346, 362-363 (S.D.N.Y. 2009); see also Town of Burlington v. Dep't of Educ., 736 F.2d 773, 799 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).

The record amply supports the SRO's finding that "the parent failed to provide the notice required by the IDEA, and therefore, is not entitled to an award o[f] reimbursement on that basis." Stevens did not cooperate with the defendant to the degree contemplated by the IDEA before she enrolled the Student in York Prep. Stevens had already arranged for six months of private tutoring and sent in the application to York Prep before the January 2007 CSE meeting at which the January 2007 IEP was created. At the meeting, Stevens did not disclose that she was already taking steps to find a ninth-grade placement for the Student. As of March 1, 2007, when Stevens decided to enroll the Student at York Prep, she certainly had an equitable duty to inform the defendant that she would be seeking tuition reimbursement for that placement. The IEP is the "centerpiece of the IDEA's educational delivery system," D.D. ex rel. V.D. v. N.Y. City Bd. of Educ., 465 F.3d at 507, and as such, the school district must be given an opportunity to work with parents on placement decisions. Even though the scheduled June 2007 review of the Student's January 2007 IEP did not take place as it should have, Stevens "let that slide" as she continued to make substantial tuition payments to York Prep

throughout the spring and summer of 2007.  This suggests a plan
to wait to notify the defendant about its failure to make a
placement recommendation for the Student until it was too late
to change the Student's placement.  In fact, Stevens waited
until after she made the final tuition payment before she even
notified the defendant that the IEP was up for review, let alone
that she was seeking tuition reimbursement for her unilateral
placement of the Student at a general education private school.
Based on these facts, the parent would be equitably barred from
reimbursement for the unilateral placement of the Student at
York Prep for 2007-08.

CONCLUSION

The defendant's October 2, 2009 motion for summary judgment
is granted and the plaintiff's November 1, 2009 cross-motion for
summary judgment is denied.  The SRO's decision is affirmed in
its entirety.  The Clerk of Court shall close the case.

SO ORDERED:

Dated:     New York, New York
           March 18, 2010

                                   _____
                                          DENISE COTE
                               United States District Judge